IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil No. 1:20CV510 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| $165,195.00 in U.S. CURRENCY, | : | |
| | : | |
| $9,702.00 in U.S. CURRENCY, | : | |
| | : | |
| $5,000.00 in U.S. CURRENCY, | : | |
| | : | |
| and | : | |
| | : | |
| $3,220.00 in U.S. CURRENCY, | : | |
| Defendants. | : | |

## **VERIFIED COMPLAINT OF FORFEITURE**

NOW COMES Plaintiff, the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1. This is a civil action *in rem* brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant properties which constitute or were derived from proceeds traceable to an offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, including without limitation violations of 18 U.S.C. § 1955 and/or violations of gambling statutes chargeable under State law and punishable by imprisonment for more than one year.

2. This action is also brought to enforce the provisions of 18 U.S.C. § 1955(d)

for the forfeiture of the aforesaid defendant properties which constitute property used in violation of the provisions of Chapter 95 of the United States Code.

3. The defendant properties were seized on December 9, 2019, while located within the jurisdiction of this Court, and have been deposited to the U.S. Customs and Border Protection Customs Suspense Account.

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant properties. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant properties were seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

6. Upon the filing of this complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute upon the properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. The facts and circumstances supporting the seizure and forfeiture of the defendant properties are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant properties; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

that judgment be entered declaring the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 8th day of June, 2020.

    Respectfully submitted,

    MATTHEW G.T. MARTIN
    United States Attorney

    /s/ Lynne P. Klauer
    Lynne P. Klauer
    Assistant United States Attorney
    NCSB #13815
    101 S. Edgeworth Street, 4th Floor
    Greensboro, NC 27401
    Phone: (336) 333-5351
    Email: lynne.klauer@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

Charles B. Parker
Special Agent
U.S. Immigration and Customs
Enforcement Homeland Security
Investigations

## DECLARATION

I, Charles B. Parker, hereby state, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am a Special Agent (SA) of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed since 2019. I am currently assigned to the HSI Winston-Salem Office, where my duties include, among others, investigating violations of Titles 8, 18, 19, 21, and 31 of the United States Code (U.S.C.). Prior to reporting for assignment, I attended training at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia, where I received instruction in Federal criminal statutes, search, seizure and arrest authority, and many other facets of federal law enforcement.

2.  Before joining HSI, I was a Special Agent of the United States Secret Service (USSS) where I was assigned to the USSS Boston Office for four years. My duties included investigating financial crimes and computer-based attacks on the nation's financial, banking, and telecommunication infrastructures. Prior to the USSS, I was a police officer in Greensboro, North Carolina for 10 years. During that time, I drafted over 50 search warrants and participated in over 500 felony investigations. These investigations resulted in arrests, seizures, interviews, and prosecutions in local, state, and federal courts.

3.  This Declaration is made in support of a Verified Complaint for Forfeiture of the following, which were seized from Christopher SHUMATE, Angel SHUMATE, J

1

GOVERNMENT EXHIBIT A

and C Entertainment, LLC d/b/a The Welcome Business Center, and/or H&L Financial on December 9, 2019:

    a. $165,195.00 in U.S. Currency;

    b. $9,702.00 in U.S. Currency;

    c. $5,000.00 in U.S. Currency; and

    d. $3,220.00 in U.S. Currency.

4. The facts and circumstances set forth in this declaration are based upon the declarant's personal knowledge of the investigation as well as information provided to me by other law enforcement officers involved in this investigation.

## The Investigation

5. Beginning in November 2019, Homeland Security Investigations (HSI) Winston-Salem, the Davidson County Sheriff's Office (DCSO), and North Carolina Alcohol Law Enforcement (NCALE), conducted a joint investigation into the Welcome Business Center (WBC) located at 6483 Old US Highway 52, Lexington, NC, after DCSO received a complaint alleging that the WBC was operating illegal video gaming-gambling machines (VGMs). The WBC is owned and operated by J and C Entertainment, LLC. Company officials listed on the Secretary of State's website are Chief Financial Officer Christopher M. Shumate and Members Jackie T. Walker and Pricilla Walker.

6. NCALE, in conjunction with DCSO, conducted a series of undercover operations which established probable cause for violations of North Carolina General Statute (NCGS) § 14-292; gambling devices, NCGS §§ 14-306/14-306.1A, slot machines,

and NCGS §§ 14-306.3/14-306.4, server-based gaming machines. Furthermore, NCALE found the VGMs awarded U.S. Currency for credits won, which is a violation of NCGS § 14-306(b)(2).

### Undercover Operations

A. <u>November 13, 2019</u>

7. On November 13, 2019, NCALE Special Agents Nutt and Hinson conducted an undercover operation at WBC for the purpose of determining if there were illegal VGMs operating at that location. As they approached the building, SA Hinson observed cameras on the exterior. TO gain entry, they pressed a doorbell and waited for an employee to unlock the door remotely.

*SA Nutt – Computer terminal slot game*

8. Upon entering WBC, SA Nutt went to the point of sale area and spoke with an employee later identified as "Rasheda." SA Nutt provided her undercover driver's license and gave the employee $60.00 of U.S. currency for credits to play the VGMs. SA Nutt proceeded to the gaming area where she observed a second employee working. SA Nutt entered the non-smoking game room where she observed approximately 21 server-based VGMs, each consisting of a computer tower, a monitor, and a mouse, 5 cabinet-style VGMs, and 2 tabletop "fish" games.

9. SA Nutt chose to play a server-based VGM operating "Oklahoma" software. After logging in, the screen showed she has 6700 "Sweeps Entries" or game credits. SA Nutt selected "Sweepstakes Entry Revealer" and was prompted to agree to the

3

"Sweepstakes Official Rules" which stated "no purchase was necessary" to enter or win the "E-Center Sweepstakes." After agreeing to the rules, SA Nutt was presented with multiple slot games consisting of three-liner and five-reel slot games. SA Nutt chose "Smokin' 7's." Like most slot games, players could win by lining up certain symbols on the virtual window either horizontally, vertically, or diagonally. The game awarded credits based on where the number and matching symbols fell in the game's pay table, and permitted bets ranging from 8 to 480 credits.

10. After making her bet, SA Nutt pressed the "reveal" button, causing the reels to spin. When they stopped, the gaming symbols were revealed. After a series of plays, SA Nutt chose to end game play and cash out with a "Sweepstakes Total Win" amount of $15.99. SA Nutt had to copy a pattern to claim her cash out prize. SA Nutt found there was no skill or dexterity involved and it was impossible to fail. SA Nutt found the VGM to be in violation of NCGS § 14-306.4 which makes it unlawful to promote or conduct sweepstakes through the use of an entertaining display, including the entry process or the reveal of a prize. SA Nutt returned to employee Rasheda and was given $15.00 in U.S. Currency for winnings; a further violation of NCGS § 14-306 in which no cash payouts of any kind may be awarded from VGM credits.

11. After receiving her winnings, SA Nutt performed a brief visual inspection of WBC. She noted there was no clock in public view, which she found consistent with a casino. Sha also observed an ATM machine inside the location, which allowed patrons quick access to cash which they could then use on the VGMs. SA Nutt also walked into

4

the smoking section of WBC where she observed 23 server-based VGMs, 5 cabinet-style machines, and 2 tabletop fish games.

*SA Hinson – Tabletop "Fish" game*

12. Inside the WBC on November 13, 2019, NCALE SA Hinson observed several rooms containing approximately 44 desktop computer, server-based VGMs, 9 cabinet-style slot VGMs, 4 "fish" game tables, and 7 patrons. SA Hinson also observed a single ATM.

13. SA Hinson entered one of the gaming rooms and sat down at a fish table which consisted of a large LCD screen which faced the ceiling and eight separate "terminals," each with its own bill receiver, allowing eight individuals to play at once. SA Hinson inserted $60.00 of U.S. Currency into one of the terminal bill receivers, which converted to 6000 "credits," and selected a game to play titled "Turtle's Rage." By pressing a button, marked "weapon" SA Hinson could wager credits from $0.05 to $2.50 each play. He bet $0.10, and then used the joystick to aim his weapon at a sea creature on the screen, then pressed the "shoot" button, causing the "weapon" to fire. Each time he fired the weapon the credits wagered were subtracted from his credit pool, and if he successfully "destroyed" a sea creature, credits were added to the pool. Prior to destroying a sea creature, the game did not reveal its credit value, how many strikes were required to destroy it, or the overall odds. SA Hinson also noted that when he intentionally aimed the weapon away from the sea creatures, to the sides of the screen, and pressed, "shoot," the bullet would ricochet and strike a sea creature randomly selected by the gaming software.

5

After a series of games, SA Hinson had 7000 credits remaining. He pressed the cash out button on the machine, which gave him a printed ticket which he presented to an employee at the point of sale area in exchange for $70.00 in U.S. currency.

14. Based on his investigation, along with his training and experience, SA Hinson concluded the VGM was disguised as an arcade game but instead operated as an illegal slot machine because the game was not operated or played for amusement. U.S. Currency was awarded for credits won, which is a violation of NCGS § 14-306(b)(2). SA Hinson also noted the VGM allowed more than eight credits to be bet during each single play, a violation of NCGS § 14-306(b)(2).

B.   November 20, 2019

15. On November 20, 2019, NCALE Special Agents Singleton and Hinson conducted a second undercover operation at the WBC. As before, the agents were required to press a bell to gain entry to the establishment.

*SA Singleton – Computer terminal slot game*

16. Upon entering the WBC, SA Singleton observed four fish table VGMs, one being titled "Monster Awakens." NCALE SA Singleton also observed approximately 44 video sweepstakes gaming terminals, which were server-based VGMs, and 9 cabinet-style VGMs. SA Singleton noted they appeared to be operating Aloha, Oklahoma, Frontier, and Phantom Software.

17. SA Singleton went to the point of sale area and spoke with an employee later identified as "Tammy." SA Singleton exchanged $60.00 U.S. currency for credits to play

6

the Frontier software based VGMs. SA Singleton then went to a Frontier VGM and signed in with the information given by employee Tammy. SA Singleton observed it was a Sweepstakes VGM which hosted different video slot games available to play.

18. SA Singleton chose the 25-liner game, "Sizzlin 7's 5 Reel." NCALE SA Singleton noted the game featured a virtual reel which only existed within the computer's memory and was programmed by the game's designer. SA Singleton found there was no skill or dexterity involved to play the slot game because the symbols are matched randomly and by chance. Through a series of winning and losing games, the VGM displayed that SA Singleton had won $98.20.

19. SA Singleton noted there was no skill game required to cash out. SA Singleton returned to the point of sale area where employee Tammy gave $98.00 in U.S. currency. SA Singleton concluded the VGM was an illegal slot machine based on NCGS § 14-306.1A and a gambling violation under NCGS § 14-292.

*SA Hinson - Stand-up cabinet-style VGM*

20. On his visit to the WBC on November 20, 2019, SA Hinson elected to play one of approximately 9 cabinet-style slot VGMs. SA Hinson gave $60.00 to an employee working at the point of sale area and identified the VGM he wanted to play. He then walked over to and sat down at the VGM. This VGM had several different types of slot games which were not dependent on skill or dexterity of the player but instead were based on the random chance of matching different pictures, words, numbers and symbols. SA Hinson chose to play a three-reel slot game called "American Buffalo" which permitted bets

ranging from $0.25 to $10.00. SA Hinson pressed play to spin the reels. After the spinning stopped, the game presented the option of "nudging" one of the reels to create a winning match. If certain symbols matched, he received credits in accordance with the game's pay chart. Through a series of winning and losing games, the VGM displayed that SA Hinson had 2000 credits remaining, the equivalent of $20.00. SA Hinson retrieved a cash out receipt and the employee at the point of sale counter gave SA Hinson $20.00 in U.S. currency.

21. Based on his investigation, along with his training and experience, SA Hinson concluded the gaming machine was disguised as an arcade game but instead operated as an illegal slot machine because it was not played for amusement. U.S. currency was awarded for credits won which is a violation of North Carolina General Statue § 14-306(b)(2). Likewise, the game provided no protections to ensure the machine's outcomes were fair and consistent.

## Search Warrant

22. On December 9, 2019, DCSO TFO Pearce appeared before Judge Hamilton of the North Carolina Davidson County Superior Court and obtained a search warrant for the Welcome Business Center based on probable cause established by NCALE undercover operations.

23. On December 9, 2019, HSI Winston Salem, NCALE, and DCSO executed the search warrant at WBC. The establishment was open for regular business and there were patrons inside playing the VGMs.

8

24. NCALE conducted gaming reviews on the VGMs which found the VGMs were non-compliant under North Carolina General Statutes. NCALE and DCSO conducted evidence processing which included monetary seizures from the establishment, including the ATM, VGMs, and point of sale area. Employee Marilyn Raquel Leach was present during the search warrant.

### Interview of Employee Marilyn Raquel Leach

25. NCALE SA Huneycutt interviewed Mrs. Leach. The following is not a verbatim account of the interview and should be considered as a general overview of the interview. Mrs. Leach stated she was hired to work at WBC on November 15, 2019 by a subject known to her as Ashley. Mrs. Leach stated the business is open 24 hours / 7 days a week. Mrs. Leach identified three other employees by first names only: Joe, Kenny, and Ashanti. Mrs. Leach further stated Ashley began calling her in response to the business' surveillance system going offline.

### Traffic Stop of A. SHUMATE

26. Surveillance was placed on the SHUMATE's residence in High Point, NC during the execution of the search warrant at WBC. As a result, surveillance identified Christopher SHUMATE and Angel SHUMATE leaving in separate vehicles from the residence during the search warrant. Traffic stops were affected on each for NCGS traffic violations.

27. DCSO Sgt. Saintsing and DCSO Det. Soles conducted a traffic stop on Angel SHUMATE for a window tint violation as she left the area in a black BMW SUV. DCSO

ended the traffic stop investigation, issued a citation for the window tint violation, and returned all documents to Angel SHUMATE.

28. DCSO Sgt. Saintsing inquired if he could ask Ms. SHUMATE a question before she left, to which she agreed. DCSO Sgt. Saintsing asked if Ms. SHUMATE had anything illegal in the vehicle and she stated she did not have any drugs in the car. DCSO Sgt. Saintsing then asked if she had any large amounts of currency exceeding $10,000.00 in her vehicle. Ms. SHUMATE hesitated before answering that she was unsure if her husband left anything in the car, but further stated there was nothing to her knowledge. Angel SHUMATE then granted consent for DCSO to search her vehicle.

29. DCSO Sgt. Saintsing deployed K-9 Taz to conduct a free air sniff of A. SHUMATE's vehicle. K-9 Taz indicated a positive alert at the rear area of the vehicle. As a result, a search was conducted and a purse was located on the passenger seat which contained several bands of U.S. currency. A black duffle bag was also located in the cargo area which also contained numerous banded bundles of U.S. currency.

30. Angel SHUMATE denied ownership of the currency in the duffle bag but went on to state that the money in the purse belonged to her and it was about $2,300.00. DCSO Det. Soles then received a handwritten witness statement by Ms. SHUMATE disclaiming most of the U.S. currency in the duffle bag. Ms. SHUMATE added that $30,000.00 located in a pink bag, inside of the duffle bag, belonged to her. Ms. SHUMATE stated the money was from working at an orthodontist office, cleaning houses, and some was gifted to her from her mother. The total currency consisted of $2,046.00 in

10

the passenger seat purse, $22,632.00 from the pink bag, and a remaining $140,517.00 in the duffle bag.

## Traffic Stop of C. SHUMATE

31. DCSO conducted a traffic stop on Christopher SHUMATE as he left the residence in a black Infinity G37. NCALE SA Huneycutt responded to the traffic stop and interviewed Mr. SHUMATE, who consented to the interview and voluntarily sat in the passenger seat of NCALE SA Huneycutt's vehicle. The following is not a verbatim account of the interview and should be considered a general overview of the interview.

32. Christopher SHUMATE stated he was the owner of The Welcome Business Center along with another person who was stated to be Jackie Walker. SHUMATE stated WBC was a Sweepstakes business. SHUMATE confirmed he had been in business for two years. SHUMATE stated the manager's name was Joe and the general manager was Ashley. SHUMATE further stated that he had picked up money that morning but did not know the amount because they were still doing the paperwork.

33. NCALE SA Huneycutt received consent to escort Christopher SHUMATE back to the SHUMATE residence and perform a consent search of the residence. No additional U.S. currency was located; however, financial documents including tax returns and bank statements were seized.

34. Christopher SHUMATE further consented to a search of his business office at 10714 Old US Highway 52, Winston Salem, NC. The business sign in the parking lot displayed Midway Auto Solutions; however, the building was comprised of office desks,

11

which had numerous bags containing brown envelopes. These envelopes had receipts from Sweepstakes locations including but not limited to "Welcome" and "Fun Zone." The envelopes had a ledger system on the outside. It included software names such as Aloha, Fuze, Fish, OK, and a Total Drop line with U.S. currency listed. Some of the envelopes also had U.S. currency inside which had not been processed yet. There were also stacks of envelopes on top of the office desks inside the main room. A total of $9,702.00 in U.S. Currency was seized from these envelopes.

35. The remainder of the building warehoused 15 stand-up gaming machines, approximately 100 desktop computers, monitors, and boxes of computer equipment, which included cords, keyboards, mice, and networking items. There did not appear to be anything related to automobiles inside or outside of the building.

### Seizures

36. DCSO seized over 100 Sweepstake VGMs, fish table motherboards, and stand-up cabinet style VGMs. DCSO also seized $165,195.00 from the traffic stop conducted on Angel SHUMATE, $9,702.00 from the 10714 Old US Hwy 52 business office, and $5,000.00 from WBC.

37. Furthermore, DCSO seized $3,220.00 from the on-site ATM within WBC. DCSO contacted the ATM owner, Johnny Heath Page with H&L Financial Inc. during execution of the search warrant. Mr. Page responded and aided with the ATM seizure. Mr. Page opened the ATMs and relinquished the $3,220.00 to DCSO.

12

Case 1:20-cv-00510 Document 1-1 Filed 06/08/20 Page 12 of 16

38. HSI was present and aided during the entirety of the search warrant and subsequent consent searches involved with the WBC operation. On December 9, 2019, the seized currency from Angel SHUMATE was converted to cashier's check made payable to U.S. Customs and Border Protection. On December 10, the seized currency from the business office and H&L Financial ATM was converted to cashier's check made payable to U.S. Customs and Border Protection. On December 13, 2019, the seized currency from WBC was converted to cashier's check made payable to U.S. Customs and Border Protection. On December 17, 2019, your declarant took custody of the cashier's checks and deposited the checks into the Treasury Suspense Account.

39. CBP initiated administrative forfeiture proceedings as to $165,195.00 in U.S. Currency, $9,702.00 in U.S. Currency, $5,000.00 in U.S. Currency, and $3,220.00 in U.S. Currency, and subsequently sent notices to all known parties with possible interest in the property. On January 10, 2020, CBP received claims from Christopher SHUMATE and Angel SHUMATE with respect to $165,195.00 seized from the vehicle of Angel SHUMATE and $5,000.00 seized from WBC. On January 28, 2020, CBP received a claim from H&L Financial with respect to $3,220.00 seized from the ATM located at WBC. Lastly, on February 3, 2020, CBP received claims from Christopher SHUMATE and Angel SHUMATE with respect to $9,702.00 seized from the business office and $3,220.00 seized from the ATM located at WBC.

## Other Suspected Gambling Businesses Linked to the Shumate Family

40. HSI has identified at least five other illegal gambling businesses linked to the Shumate family, detailed below:

- Angel's Arcade – 3726 and 3724 South Holden Road, Greensboro, North Carolina;

- Fruit Stand – 1910 South Highway 66, Kernersville, North Carolina;

- Salisbury Biz Center Fish Arcade – 475 Jake Alexander Blvd., Salisbury, North Carolina;

- Fun Zone – 723 E. Mountain Street, Kernersville, North Carolina;

- Fun Zone 2 – 1404 North Main Street, Kannapolis, North Carolina;

    o A contract executed by [Christopher] Michael Shumate on January 25, 2018, shows that he agreed to sell the rights to Fun Zone 2 to R. Patel in exchange for $33,000.00; the parties further agreed that, going forward, Patel would lease the gaming software and equipment from Shumate in exchange for 25% of the business's net profits.

## RELEVANT NORTH CAROLINA STATUTES

41. Relevant North Carolina Statutes include the following:

- "It shall be unlawful for any person to operate, allow to be operated, place into operation, or keep in that person's possession for the purpose of operation any video gaming machine as defined in subsection (b) of this section . . . ." N.C. Gen. Stat. Ann. § 14-306.1A.

    o "[A] video gaming machine means a slot machine as defined in G.S. 14-306(a) and other forms of electrical, mechanical, or computer games such as . . . [a] video game based on or involving the random or chance matching of different pictures, words, numbers, or symbols not dependent

on the skill or dexterity of the player." N.C. Gen. Stat. Ann. § 14-306.1A(b).

   o "Violation of G.S. 14-306.1A is a violation of the gambling statutes for the purposes of G.S. 18B-1005(a)(3)." N.C. Gen. Stat. Ann. § 14-306.2.

- "It shall be unlawful for any person, firm or corporation to operate, keep in his possession or in the possession of any other person, firm or corporation, for the purpose of being operated, any slot machine or device where the user may become entitled to receive any money, credit, allowance, or any thing of value, as defined in G.S. 14-306. Each time said machine is operated as aforesaid shall constitute a separate offense." N.C. Gen. Stat. Ann. § 14-301.

- "It is unlawful for any person to possess any game terminal with a display that simulates a game ordinarily played on a slot machine regulated under G.S. 14-306 or a video gaming machine regulated under G.S. 14-306.1A for the purpose of promoting, operating, or conducting a server-based electronic game promotion." N.C. Gen. Stat. Ann. § 14-306.3(b).

    - "'Server-based electronic game promotion' means a system that meets all of the following criteria: (1) A database contains a pool of entries with each entry associated with a prize value. (2) Participants purchase, or otherwise obtain by any means, a prepaid card. (3) With each prepaid card purchased or obtained, the participant also obtains one or more entries. (4) Entries may be revealed in any of the following ways: a. At a point of sale terminal at the time of purchase or later. b. At a game terminal with a display that simulates a game ordinarily played on a slot machine regulated under G.S. 14-306 or a video gaming machine regulated under G.S. 14-306.1A." N.C. Gen. Stat. Ann. § 14-306.3.

- "[I]t shall be unlawful for any person to operate, or place into operation, an electronic machine or device to do either of the following: (1) Conduct a sweepstakes through the use of an entertaining display, including the entry process or the reveal of a prize. (2) Promote a sweepstakes that is conducted through the use of

an entertaining display, including the entry process or the reveal of a prize." N.C. Gen. Stat. Ann. § 14-306.4(b)(1).

- "Entertaining display" includes a "[a] video game based on or involving the random or chance matching of different pictures, words, numbers, or symbols not dependent on the skill or dexterity of the player. . . . Any other video game not dependent on skill or dexterity that is played while revealing a prize as the result of an entry into a sweepstakes." N.C. Gen. Stat. Ann. § 14-306.4(a)(3).

- "[A]ny person violating the provisions of G.S. 14-306.3(b) involving the possession of five or more machines prohibited by that subsection is guilty of a Class G felony." N.C. Gen. Stat. Ann. § 14-309.

## CONCLUSION

42. Based on the foregoing, there is probable cause to believe that the properties described in paragraph 3 above and seized on December 9, 2019, are subject to seizure and forfeiture pursuant to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 18 U.S.C. § 1955(d).

This the 8 day of June, 2020.

_____
Chares B. Parker
Special Agent
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

16